UNITED STATES of America, Plaintiff-Appellee,

v.

Charles E. GRIFFIN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Rudy MONTANO, Defendant-Appellant.

Nos. 71-2940, 71-2984.

United States Court of Appeals, Ninth Circuit.

July 5, 1972.

Rehearing Denied in No. 71-2984 Aug. 9, 1972.

J. Michael Reed (argued), of Reed & Flickinger, San Diego, Cal., Howard E. Beckler (argued), Hollywood, Cal., for defendant-appellant.

James W. Meyers, Asst. U.S. Atty. (argued), Stephen G. Nelson, Asst. U.S. Atty., Harry D. Steward, U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before KOELSCH and TRASK, Circuit Judges, and BYRNE, Sr.,* District Judge.

WILLIAM M. BYRNE, Senior District Judge:

At a jury trial, appellants Griffin and Montano were found guilty on one count of conspiracy to import heroin into this country, a violation of 21 U.S.C. § 174. Each appellant was sentenced to fifteen-year prison terms.

Appellants initially argue they were denied the right to due process and to a speedy trial because of the government's dilatory conduct in bringing their case to trial. The facts surrounding this argument are not in dispute. On June 10, 1970, the Grand Jury returned a one-count indictment charging appellants and six others with conspiring to import and bring heroin into the United States. The overt acts relating to appellants were alleged to have been committed in 1968. In September of that year, Agent Peter Fong of the United States Bureau of Narcotics and Dangerous Drugs arrested Lorenzo Rodriguez for violation of Federal narcotic laws. Subsequent to this arrest, Fong met with Rodriguez in March of 1969 at the latter's request. At this meeting Rodriguez stated that Maria Bueno de Macias, a resident of Mexico, was his source of narcotics. Rodriguez also implicated three men as being connected with his supply of narcotics. As a result of this conversation, Rodriguez secured his release on bail and was instructed by Agent Fong "to penetrate the organization in which he was involved, the smuggling of narcotics in Mexico."

* William M. Byrne, Sr., United States Senior District Judge, Central District of California, sitting by designation.

The effort to "penetrate" the Mexican organization proved futile, and in September of 1969, Fong directed Rodriguez' attention to divulging the identities of his American contacts. At this time, Rodriguez named Montano as one such contact. In December of that year, Rodriguez indicated that "C.G." (later identified as appellant Charles Griffin) was another such contact.

Within the next three to four months, the remaining contacts were fully identified. Thereafter, Fong and his co-agents submitted their case to the office of the United States Attorney which secured a secret indictment in June, 1970. Hoping that de Macias would return to the United States,[1] the government delayed the issuance of arrest warrants for the indicted defendants on the ground that such action would alert de Macias of the Grand Jury's charges and thus precludes her re-entry into this country. When the hoped for return of de Macias did not occur, the government finally issued arrest warrants for the remaining indicted co-conspirators on February 1, 1971. Two months later the trial court denied appellants' motion to dismiss for failure to prosecute.

■ The government's delay in seeking immediate indictments even though it had learned of appellants' alleged illicit conduct, and its further procrastination in seeking arrest warrants and in commencing its prosecution constituted in the appellants' view, denials of Fifth and Sixth Amendment guarantees. Specifically, appellants contend that the unjustified delaying tactics of the government seriously prejudiced their "ability to recall and to secure evidence of [their] activities at the time of the events in question."

Recently, the Supreme Court addressed itself to the very contention raised by the instant appellants. In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), it

was argued the defendants had been deprived of their rights to due process and a speedy trial because 38 months elapsed from the time the government learned of their alleged criminal conduct and the time an indictment was returned charging them with these crimes.

The court rejected both contentions. Firstly, it held that "the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' an event that occurred in this case only when the [defendant was] indicted . . ." 404 U.S. at 313, 92 S.Ct. at 459. Accordingly, the court stated that "the reach of the [Sixth] amendment [does not extend] to the period prior to arrest." 404 U.S. at 321, 92 S.Ct. at 463.

■ The ruling in *Marion* clearly disposes of appellants' assertion they were denied their Sixth Amendment rights. The thrust of their position is that the denial to a speedy trial commenced at the time the government was informed of their criminal conduct, but delayed upwards of eight months to secure indictments from the Grand Jury. Because the Sixth Amendment guarantees do not extend to persons who do not stand "accused" of any crime, the argument advanced must be rejected.

■ Secondly, the court acknowledged the possibility of a due process violation if the pre-indictment delay resulted in "substantial prejudice" to the defendant's ability to receive a fair trial and was employed as an "intentional device to gain tactical advantage over the accused." In so acknowledging, the court indicated that an indictment returned prior to the running of the statute of limitations was generally considered a safeguard against the prosecution of stale crimes. Additionally, the court ruled that real prejudice must be shown, and that mere possibilities "that memories will dim, witnesses [may be] inaccessible, and evidence [will be] lost" are

---

1. In September, 1969, Agent Fong was advised by a customs agent that de Macias had entered the United States at Douglas, Arizona. Believing he lacked sufficient probable cause, Fong chose not to order her arrest.

not sufficient to establish a due process violation.

In the present situation, the indictment was returned within the statutory period as were the execution of the arrests. Although they claim to have been prejudiced by the delays, appellants have failed to set forth any specific examples of such prejudice. Although the appellants charge that the "delay in the case at bar was inordinate . . . and unjustified," they fail to set forth anything other than bald conclusions which might even approach the possibility that the government's purpose was to gain a tactical advantage over them. In short, the appellants' conclusory allegations are without persuasion that they have been denied the right to due process.

■ Appellants further contend that the trial court erred when it denied their motion to dismiss the indictment. The basis of this motion was improper joinder in that the indictment charged one conspiracy but the government's case-in-chief "indicated several separate conspiracies" were involved. In appellants' view, combining several conspiracies into one charge worked to their "serious" prejudice because associating them with the other defendants constituted a "guilt transference."

The basis of the contention that the evidence adduced by the government in its case-in-chief was at odds with the Grand Jury's single count indictment is the testimony of Rodriguez, described by appellant Montano as "a man willing to implicate anyone he believed necessary in order to curry favor with the Government on his own pending narcotics smuggling case." In his testimony, Rodriguez indicated that he had been careful to meet with only one contact at a time and that de Macias' policy was not to disclose the names of other contacts at these meetings. Rodriguez' adherence to this policy was such that two of the persons indicted with the appellants testified as to having no knowledge of their supplier's other contacts. Indeed, one of these defendants, Joseph Balfour,

stated Rodriguez had told him that he was his only purchaser. Balfour believed Rodriguez' representation because his first purchase of six ounces of heroin indicated Rodriguez "wanted to make it worth while to come." In sum, the government attempted to prove the charges made in the one-count indictment by eliciting testimony showing that de Macias supplied the heroin to Rodriguez who then served as the Mexican connection, on an individual basis for several different purchasers.

Appellants liken the instant factual setting to the one in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). There, thirty-two persons were indicted for a single conspiracy to violate the National Housing Act by inducing lending institutions to make loans which could be offered to the Federal Housing Administration for insurance on the basis of false and fraudulent information. Of those indicted, nineteen were prosecuted, thirteen had their cases submitted to the jury which acquitted two, convicted seven and "hung" on four. The evidence proved at least eight different conspiracies consisting of several defendants whose only connection with each other was that all had their fraudulent applications handled by a broker named Brown. Quoting from the Court of Appeals, the court found this evidence to be at variance with the indictment in that several conspiracies had been proven:

> " 'Thieves who dispose of their loot to a single receiver—a single "fence"— do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a "fence" to make them such.' " 328 U.S. at 755, 66 S.Ct. at 1243.

The court determined that in the context of that case, the variance could not be deemed harmless error. Additionally, the court found the error to be compounded by the trial court's instructions which charged that only one conspiracy was the subject of the indictment and a finding of guilty depended upon the de-

termination that "each of the defendants was a member of that conspiracy." 328 U.S. at 767, 66 S.Ct. at 1249.

In Rocha v. United States, 288 F.2d 545 (9th Cir.1961), this court held the evidence was at variance with the indictment and that under the circumstances constituted prejudicial error within the holding of Kotteakos. There, the six appellants, along with eight indicted co-conspirators and six unindicted co-conspirators, were charged in a single count with conspiring to defraud the United States. The object of the conspiracy was to obtain preferred immigrant status by entering into sham marriages with United States citizens. The court concluded that six conspiracies had been established at trial because each "married couple" was not "interested in any marriage but [its] own." The court came to this conclusion even though one of the indicted co-conspirators had been either a witness to or responsible for all the marriages in question.

Similarly, appellants rely upon Daily v. United States, 282 F.2d 818 (9th Cir. 1960), where this court had occasion to distinguish the type of evidence which would or would not support a one-count conspiracy indictment. In that case, sixteen persons were the subject of the indictment. Of those indicted, eight had the charges dismissed, one had his trial severed and of the remaining seven, three were acquitted and four were found guilty. The essence of the conspiracy was to sell narcotics obtained by way of drug store burglaries. With regard to appellant Ribero, the court found the evidence of sufficient force to support the inference that Ribero "knew that the narcotics he had received and dispensed were but a small part of the total amount of narcotics which his suppliers were distributing through concerted efforts." The court based its finding on the fact that Ribero had received drugs from three indicted co-conspirators, including the scheme's "central figure," as well as from an unindicted co-conspirator. Additionally, at the time Ribero had taken drugs in the presence of the central figure and another co-conspirator, he was told the narcotics had been burglarized from a drug store. On another occasion, Robero had taken drugs with other co-conspirators.

By contrast, the court determined that the evidence did not support the jury's verdict that appellant Quinn "was connected with a single, overall conspiracy . . .". The court's determination recognized that Quinn had conspired with defendants Graham and Hannah, but resisted concluding he "knew that he and Graham and Hannah were not alone in unlawfully dispensing narcotics." Citing Kotteakos, the court held that this variance could not be deemed harmless error.

The government argues that should the court sustain the appellants' position that a variance had been established, this alone would not be sufficient ground for reversal. The government advances a two-prong argument in support of this position. Firstly, it draws an analogy between this factual setting and the one in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In Berger, it was conceded by the government that the evidence established two conspiracies rather than one as charged in the indictment. Of the two conspiracies one defendant (not Berger) was common to each. Despite this variance, the court was of the view that Berger had not been prejudiced by this error. In so ruling, the court likened the situation to one where four defendants are indicted on two separate conspiracies but the evidence fails to connect one of the persons with one of the conspiracies, thus resulting in a conviction on one count and an acquittal on the other. Under such circumstances, such a defendant could not claim "his substantial rights [had] been . . . affected." In Kotteakos, the court refused to extend the Berger reasoning "to a situation in which one conspiracy

only is charged and at least eight having separate, though similar objects, are made out by the evidence, if believed; and in which the more numerous participants in the different schemes were, on the whole, except for one, different persons who did not know or have anything to do with one another."

Here, the government's case-in-chief established at least five conspiracies (those involving the two appellants, and three involving other indicted purchasers of Rodriguez). Although the transactions were conducted in largely the same manner, none of the purchasers had "anything to do with one another." Even were we to assume that the circumstances which persuaded the court not to extend the *Berger* reasoning to the setting of *Kotteakos* to be present here, we agree with the government that the instant case and those relied upon by appellants are factually distinct.

The second prong of the government's position that the variance did not prejudice the appellants is the following cautionary instruction read to the jury:

> "Now, suppose—just because I don't know what your findings are going to be—but suppose that you do not find that the government has proven beyond a reasonable doubt the defendants Montano and Griffin were a part of the same single overall conspiracy. I don't know whether you can find that or not. That, of course, is your determination. There is an alternate area of the law that I wish to call to your attention, and that has to do with the individual conspiracies that may be found in this indictment.
>
> "If you do not find beyond a reasonable doubt that the defendant Montano conspired with defendant Griffin —that is they were in the same and single conspiracy—but find that the defendant Montano did conspire with Lorenzo Rodriguez and or Maria Bueno and or with others you may, if

the evidence so convinces you beyond a reasonable doubt, find defendant Montano guilty of the conspiracy. However, under this circumstance—to which I'm just making reference—you cannot consider any evidence except that which was admitted against defendant Montano. Likewise if you do not find beyond a reasonable doubt that defendant Griffin conspired with defendant Montano in one single overall conspiracy, but find that the defendant Griffin did conspire with Lorenzo Rodriguez and/or Maria Bueno or with others you may, if the evidence so convinces you beyond a reasonable doubt, find the defendant Griffin guilty of conspiracy."

By so instructing the jury, the trial court avoided one of the major errors committed in *Kotteakos*, namely failing to differentiate between conspiracies. Indeed, the cautionary practice followed at the instant trial was the very procedure recommended by the Seventh Circuit in United States v. Varelli, 407 F.2d 735, 746 (7th Cir.1969):

> "Since the existence of multiple conspiracies is really a fact question as to the nature of the agreement, it is for the jury to decide whether there is one agreement or several. (citations omitted) Therefore, . . . when the possibility of a variance appears, [the district judge] should instruct the jury on multiple conspiracies as well." (citations omitted)

Accord, United States v. Bless, 422 F.2d 210, 213 (2d Cir.1970).

The cautionary instruction largely attenuated any prejudice flowing from the establishment of the variance. Indeed, it should be noted that in none of the cases relied upon by appellants was such an instruction given. Accordingly, we conclude the trial court's action placed a clamp on any possible prejudice which might have seeped from the variance.

**1358**

██ As an adjunct to the argument relating to prejudicial variance, appellant Griffin claims the trial court erred in denying his motion to sever. In large part, this claim is a reiteration of the assertions already set forth, e. g., "evidence of deliveries made by Rodriguez with other parties must certainly have prejudiced appellant's case adversely, even though he had no connection with these parties or knowledge of their activities."

Absent a strong showing of prejudice, the denial of a motion for severance will not be reversed on appeal. Daut v. United States, 405 F.2d 312, 316 (9th Cir.1968). No such showing was made in the instant case. In support of this view, the government cites United States v. Patterson, 455 F.2d 264, (9th Cir. 1972), a case where joinder was deemed proper because the co-defendant had engaged in "schemes [which] were basically the same" and because the defendants had been charged in each count of the indictment, thus "providing a common link between all of the defendants." Additionally, each piece of evidence was "carefully labelled" as to which defendant it pertained. This segregation extended to the trial court's instructions to the jury. Under these circumstances, this court held that claim of substantial prejudice resulting from the denial of severance had not been substantiated.

Here, it cannot be said the joinder provisions of Rule 8 of the Federal Rules of Criminal Procedure had been abused given the fact that the participants in and the *modus operandi* of the illegal heroin importation were virtually identical. Additionally, the trial court's cautionary instruction was sufficient to blunt the force of any serious prejudice which might have surfaced as a result of linking appellants together in the indictment and at trial.

Affirmed.