UNITED STATES of America,
Plaintiff-Appellee,

v.

Cecil Ray JOHNSON,
Defendant-Appellant.

No. 74–1514.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1974.

Decided May 9, 1975.

Rehearing Denied June 4, 1975.

Julius L. Echeles, Carolyn Jaffe, Chicago, Ill., for appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and Michael D. Groark, Asst. U. S. Attys., Chicago, Ill., for appellee.

Before HASTINGS, Senior Circuit Judge, and SWYGERT and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Appellant participated in three purchases of stolen Cadillacs. A jury found him guilty on three substantive counts charging violations of the Dyer Act and on a conspiracy count charging that he and six other defendants were members of a single conspiracy to dispose of stolen motor vehicles moving in interstate commerce.[1] On the conspiracy count the government's proof fell far short of its charge since the evidence linked appellant to only one of his codefendants and placed the others in what we must assume to have been an entirely separate conspiracy. Inasmuch as the consequences of the variance were not adequately explained to the jury, the principal question on appeal is whether the error requires reversal. In addition, appellant challenges both the admissibility and the sufficiency of evidence of his knowledge that the Cadillacs were stolen, and criticizes the instructions to the jury.

---

1. In Count I, Johnson was charged with conspiracy with Gerald J. Altier, Adam J. Jung, Joseph L. Altvare, Judy M. Altvare, Kenneth E. Getty, and Louis J. Solone, Jr. "to receive, conceal, store, barter, sell and dispose of stolen motor vehicles which were moving as, which were a part of, and which did constitute interstate commerce, in violation of Title 18, United States Code, Section 2313." Count II charged a substantive offense by Altier, Jung, and the Altvares; Count III, Joseph Altvare alone; Count IV, Johnson and Joseph Altvare; Count V, Johnson alone; Count VI, Altier, Jung, and Getty; Count VII, Johnson alone; Count VIII, Altier, Jung, Joseph Altvare and Getty; Count IX, Altier and Jung; Count X, Altier, Jung, and Solone.

Altier and Jung pleaded guilty before trial and testified as government witnesses; Johnson was found guilty on Counts I, IV, V, and VII; Joseph Altvare was found guilty on Counts I, III and VIII, but not guilty on Counts II and IV; the remaining defendants were acquitted. Johnson received a concurrent sentence of 120 days on each count. Only Johnson appeals.

18 U.S.C. § 2313 provides:

"Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle

The evidence which was admissible against appellant related to three stolen Cadillacs. Appellant acquired one for his own use in November, 1970, and sold the other two to Vincent Maltese in December, 1970, and January, 1971, respectively. One digit of the registration number of all three cars had been altered by the same tool; the application for an Illinois title for each car was supported by a false New York registration. Maltese paid a bargain price for both cars as measured by the wholesale and retail values listed in the "Red Book" published by National Market Reports.[2]

A government agent testified that appellant told him that all three Cadillacs had been obtained from John Dennis, a name which appeared on one of the New York title registrations. Maltese testified that defendant Altvare was present

when he purchased one car from appellant and that appellant had introduced Altvare "as being the man that he got the car from."[3]

■ This evidence was sufficient to prove that appellant knew the Cadillacs were stolen. We reject appellant's argument that the testimony about "Red Book" values was inadmissible hearsay.[4] We also reject the argument that the jury was erroneously permitted to rely on appellant's possession of recently stolen property as a circumstance from which it might infer that he knew the property had been stolen.[5] It is true, as appellant argues, that the record contains an "explanation" of his possession,[6] but the law does not require the jury to credit his explanation or to accept it as satisfactory.[7]

or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

18 U.S.C. § 371 provides, in pertinent part:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. He paid $4,500 for the car purchased in December and $4,300 for the car purchased in January. The wholesale value of each car was over $5,000 and the retail value almost $6,000.

3. This reference to Altvare by Maltese appears to be the only evidence in the record which both (a) was admissible against appellant and (b) referred to any of his alleged co-conspirators.

4. We think that an adequate foundation was established by the lengthy testimony by witness O'Brien explaining how "Red Book" data are collected and used. Any weakness inherent in the use of "Red Book" figures caused by the fact that they represent only averages and do not take into consideration the condition of any particular automobile was adequately brought out on cross-examination.

The "Red Book," published by National Market Reports for over 64 years, was admissible

under the Market Reports and Commercial Publications exception to the hearsay rule. Rule 803(17) of Federal Rules of Evidence, Act of January 2, 1975, Pub.L. No. 93–595. While these Federal Rules were not in effect during Johnson's trial, they could be used as guidelines in making evidentiary rulings, as we said in United States v. McCarthy, 445 F.2d 587, 591 (7th Cir. 1971). See Curtis v. Schwartzman Packing Co., 61 N.M. 305, 299 P.2d 776, 778 (1956); Dearborn Motors Credit Corp. v. Hinton, 221 Miss. 643, 74 So.2d 739, 742 (1954); cf. Virginia v. West Virginia, 238 U.S. 202, 212, 35 S.Ct. 795, 59 L.Ed. 1272; Fennerstein's Champagne, 70 U.S. (3 Wall.) 145, 148, 18 L.Ed. 121; Fraser-Smith Co. v. Chicago, Rock Island & Pac. R.R. Co., 435 F.2d 1396, 1402 (8th Cir. 1971). See generally 6 Wigmore on Evidence § 1704 (3rd ed. 1940).

5. The relevant instruction to the jury read, in part:
"However possession of property recently stolen, if not satisfactorily explained, is a circumstance from which you may reasonably draw the inference and find that the person in possession knew the property had been stolen." (Tr. 1583).

6. According to the testimony of a government agent, appellant explained that he had obtained the cars from John Dennis. Appellant also relies on the fact that he used his Cadillac as collateral for a bona fide bank loan and the further fact that he made payments on that loan after the car had been repossessed as an "explanation" of his honorable intentions.

7. See Barnes v. United States, 412 U.S. 837, 845 n. 9, 93 S.Ct. 2357, 37 L.Ed.2d 380. In

The findings of guilt on the three substantive counts are supported by the record.[8]

We may assume that the evidence which we summarized above would be sufficient to support a finding that appellant conspired with defendant Altvare to violate the Dyer Act. Plainly, however, it did not prove that appellant participated in a conspiracy with any of the other five co-defendants, or in the separate conspiracy between Altvare and those other defendants. Most of the government's evidence related to activities of Altvare, who, in cooperation with other defendants, disposed, or attempted to dispose, of five Cadillacs and a Buick through the so-called A&J used car lot. There is no evidence that appellant had any connection with any of those six vehicles or with the A&J lot. The two operators of that lot pleaded guilty and testified for the government. Their testimony related entirely to activities of Altvare and other co-defendants. Neither they, nor any other witness, implicated appellant in the sales made through A&J or gave any testimony implying that appellant knew about the A&J activities or that the A&J participants (other than Altvare) ever heard about appellant, let alone knew of his business transactions with Maltese and Altvare. We therefore agree without reservation with appellant's argument that the evidence was insufficient to establish his participation in the single overall conspiracy charged in the indictment.[9]

It necessarily follows that appellant was entitled to have the jury instructed that evidence which related only to the A&J transactions was not admissible against him.[10] It was plain error to fail

---

answer to appellant's argument that the instruction improperly shifted the burden of proof, see Barnes, supra, at 846 n. 11, 93 S.Ct. 2357. Nor do we find merit in appellant's contention that the "recent possession" instruction failed to remind the jury (a) that, even if no reasonable explanation was forthcoming, they must not convict if they entertained a reasonable doubt of defendant's guilt, and (b) that, if they found defendant's explanation satisfactory, they must acquit. It is axiomatic that jury instructions must be viewed as a whole; here the trial judge had adequately instructed the jury on the presumption of innocence and the government's burden of proof beyond reasonable doubt.

Nor do we believe the standard LaBuy "knowledge" instruction that "No person can intentionally avoid knowledge by closing his eyes to facts which prompt him to investigate," was erroneous for failing to instruct that guilt could not be predicated on mere negligence. See United States v. Grizaffi, 471 F.2d 69, 75 (7th Cir. 1972), cert. denied, 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684.

Finally, Johnson argues that it was error to refuse to give the "two conclusions" instruction:

"If two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, the jury should adopt the one of innocence."

But since the trial judge adequately described the government's obligation to prove the defendant guilty beyond a reasonable doubt, the failure to give such an instruction is not reversible error. United States v. Maenza, 475 F.2d 251, 254 (7th Cir. 1973).

8. At oral argument, counsel for Johnson suggested that the prejudice suffered by Johnson as a result of the variance on the conspiracy count would also carry over to the substantive counts. Assuming that Johnson was prejudiced with respect to the conspiracy count, it does not follow that the convictions for the substantive offenses were tainted. Johnson was found guilty of the offenses stated in Counts IV, V, and VII. He was the only defendant allegedly involved in the transactions described in Counts V and VII. In Count IV, Joseph Altvare was charged as well, but the testimony of Maltese sufficiently linked Altvare to this transaction. There was no evidence that would have been admissible only against members of the A&J conspiracy that in any way related to the transactions that formed the basis for these substantive counts. United States v. Varelli, 407 F.2d 735, 747 (7th Cir. 1969), does not stand for the blanket proposition that reversal of a conspiracy conviction because of this type of variance automatically requires the reversal of substantive convictions as well.

9. Commendably, the government does not argue to the contrary.

10. In United States v. Varelli, 407 F.2d 735, 746 (7th Cir. 1969), we stated that "when the possibility of a variance appears, [the district judge] should instruct the jury on multiple conspiracies as well." Cf. United States v. Griffin, 464 F.2d 1352, 1357 (9th Cir. 1972), cert. denied, 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302. But, where, at the close of testimony, it is clear, as here, that a jury could not

to give such an instruction. Moreover, in the absence of such an instruction, we cannot possibly be sure that the jury's verdict on the conspiracy count was unaffected by that evidence.[11] Both the quality and the character of that evidence unquestionably increased the likelihood that the jury would find appellant guilty of conspiracy with Altvare.[12] For, under the court's instructions, the jury may have inferred that appellant and the A&J defendants were members of the same conspiracy simply because they both obtained stolen Cadillacs from Altvare. With the A&J evidence excluded, the jury might not even have been persuaded beyond a reasonable doubt that Altvare was the source of appellant's contraband.

find a single overall conspiracy as a matter of law, the defendant is not only entitled to a multiple conspiracies instruction but also to an instruction that evidence relating to the other conspiracy or conspiracies disclosed may not be used against him under any circumstances. *Cf.* United States v. Calabro, 449 F.2d 885, 893–894 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801; United States v. Bless, 422 F.2d 210, 213 (2d Cir. 1970); United States v. Kelly, 349 F.2d 720, 756–757 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544; United States v. Borelli, 336 F.2d 376, 385–387 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555.

11. Under the harmless error test as stated in Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, we must reverse unless "the conviction is sure that the error did not influence the jury, or had but very slight effect . . . ."

12. A major part of the statement of facts in the government brief summarized evidence which was not admissible against appellant, but which, under the court's instructions, the jury may have considered in finding him guilty of conspiracy. We quote those portions of the government brief to illustrate the importance of this inadmissible evidence:

"The first stolen 1970 Cadillac arrived in Chicago from New York in November, 1970. Altvare sold it to George Kanellopoulos for $4,500 cash. He explained to a co-worker of his wife, who had put him in touch with Kanellopoulos, that he had obtained the car from a friend in the car leasing business. (Tr. 997, 1006–07). Altvare gave his buyer a New York registration in the name Julius Friedman which Kanellopoulos used to obtain Illinois title for the Cadillac.

"During November, 1970, Altvare also sold his own 1970 Cadillac to Cullerton Cadillac, a legitimate retail dealer, where he had bought it only six months earlier. (Tr. 712). Defendant Getty was a salesman at Cullerton. At this same time Getty told defendants Altier and Jung about a Mr. Blue who owned a leasing company that would soon be selling used Cadillacs and other luxury autos. Altier and Jung were interested in this type of business for their used car lot; and, when they had heard nothing from Getty or Blue about the deal in the next month or so, they called Getty about it.

"Shortly thereafter, Altvare came to the A&J lot and introduced himself to Altier and Jung as Mr. Blue, the man from the leasing company. (Tr. 296–302; 529–32). At that time he asked about the business' hours and how a car could be delivered to the lot after closing.

"In the latter part of January, 1971, Altvare called A&J and indicated that a Cadillac was en route from California. Three or four days later, one of the stolen 1970 Cadillacs was left on the A&J lot during the night with a false California certificate of ownership drawn in the name Robert Pelle. (Tr. 307–10; 533–36). Altier and Jung sold this auto at a dealers' auction early in February, 1971, and gave Getty a check drawn to Pelle for $4,600 (Tr. 314–17; 538–40). Altvare eventually returned to the lot with the Pelle check and asked them to draw another check to 'Cash' which they did. (Tr. 318–19; 540–41).

"While Altvare was getting this check, Altier and Jung asked about purchasing additional Cadillacs; and Altvare told them another would be delivered in a few days. Another stolen 1970 Cadillac was left at the lot with another false California title certificate. Altier and Jung sold this auto to a customer for $4,600 and paid Altvare $4,100 on the evening following their sale. Altvare also promised that there would be another Cadillac delivered in a short time. (Tr. 320–31; 542–46).

"In the meantime Altier met Altvare's wife, Judy, who told him she wanted to sell a 1970 Buick Electra. (Tr. 341). That same night the Buick was delivered to the A&J lot with an Illinois title in Judy Altvare's name. (Tr. 342, 346). The following day Altvare told Altier his true identity and that the two Cadillacs had been stolen. (Tr. 345; 555). He also told them that two more Cadillacs were en route. These cars were also delivered to the A&J lot during the night within a short time. Altier and Jung sold the first of these stolen 1970 Cadillacs, supported by false California title, to George Rusick for $4,600 and paid Altvare $4,100 for it. Two

Nevertheless, for two reasons the government argues that reversal is not required. First, relying on Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, the government contends that a variance involving only two conspiracies instead of one is not fatal, at least if the facts are so well defined that there is little or no risk of confusing the jury. Second, since appellant objected to an instruction proposed by the government which, if it had been given, would have allowed the jury to disregard the A&J evidence if it found two separate conspiracies, the government claims that the error was waived. Neither argument is persuasive.

Of course, every variance is not fatal. In *Berger* the Court held that proof of two conspiracies instead of one was harmless, and in *Kotteakos* the Court held that proof of eight conspiracies instead of one was prejudicial. It is not correct, however, to interpret these cases as requiring the question of prejudice to be answered simply by counting the number of conspiracies proved. For it is clear that there are cases in which a variance involving only two conspiracies is sufficiently prejudicial to require reversal,[13] and it is equally clear that the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood of confusion or prejudice. In Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154, for exam-

ple, the Court's determination of no prejudice in a case arguably involving two conspiracies relied heavily on the assumption that the jury faithfully followed the Court's direction not to consider the admissions of Goldsmith and Weiss when passing on the guilt or innocence of Blumenthal, Feigenbaum and Abel.[14] The Court plainly stated, however, that a failure to instruct the jury to disregard the evidence which was not admissible against Blumenthal, Feigenbaum and Abel would have required reversal as to them.[15] We think the failure in this case to instruct the jury to disregard the evidence concerning Altvare's activities with other defendants, summarized in our quotation from the government brief in n. 12, *supra*, likewise requires reversal of appellant's conspiracy conviction. The Supreme Court's analysis of the prejudice question in both *Kotteakos* and *Blumenthal* forecloses an interpretation of *Berger* that would treat every two-conspiracy variance as harmless error.

■ Nor do we believe that the fact that appellant objected to the two-conspiracy instruction tendered by the government constitutes a waiver of this plain error. The proposed instruction was not adequate because it would have permitted the jury to consider the A&J evidence admissible against appellant if the jury found one single overall conspir-

---

days later, they received the second promised Cadillac and a false New York registration card for it. They sold this car to Louis Maschio for $5,100 which they apparently kept by previous arrangement with Altvare. (Tr. 351–56; 560–64). When the authorities began investigating these stolen Cadillacs, it was ascertained that the Buick purchased from Mrs. Altvare had also been stolen in New York." Government's Brief pp. 2–4 (footnotes omitted).

**13.** *See, e. g.*, United States v. Russano, 257 F.2d 712, 715–716 (2d Cir. 1958).

**14.** "But the trial court's rulings, both upon admissibility and in the instructions, leave no room for doubt that the admissions were adequately excluded, insofar as this could be done in a joint trial, from consideration on

the question of their guilt. The rulings told the jury plainly to disregard the admissions entirely, in every phase of the case, in determining that question. The direction was a total exclusion, not simply a partial one as the Government's argument seems to imply. The court might have been more emphatic. But we cannot say its unambiguous direction was inadequate. Nor can we assume that the jury misunderstood or disobeyed it." 332 U.S. at 551–553, 68 S.Ct. at 253–254 (footnotes omitted).

**15.** "If therefore it were shown, or even were doubtful, that the admissions had been improperly received as against Blumenthal, Feigenbaum and Abel, reversal would be required as to them." *Id.* at 551, 68 S.Ct. at 253 (footnote omitted).

acy.[16] But there was not sufficient evidence in the record to justify a finding of a single conspiracy, and, therefore, the court should have told the jury unequivocally that the evidence relating to the A&J lot was not to be considered against appellant. Moreover, appellant's counsel did repeatedly argue that the record disclosed two conspiracies instead of one, and that appellant was therefore entitled to an acquittal as a matter of law. Although counsel was asking for too much, the fact that he vigorously brought the variance to the court's attention forecloses a holding that appellant has waived the plain error disclosed by the record.

■ We conclude that the judgment on the conspiracy count must be set aside. We are not persuaded, however, that this error tainted the verdict on the substantive counts. The defect in the conspiracy conviction does not affect the joinder of substantive counts, *see* Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921; the evidence pertaining to the A&J lot was therefore properly before the jury. That evidence was relevant to the charges against appellant only to the extent that it shed light on Altvare's status as the probable source of the stolen cars. Altvare's status was of critical importance in the conspiracy count because he was the only defendant with whom appellant even arguably might have conspired. But Altvare's status was a matter of indifference in connection with the proof of appellant's guilt on the substantive counts. For there was ample proof that appellant knew the Cadillacs were stolen, regardless of whether or not Altvare played any significant part in appellant's purchases. Indeed, Altvare was not even named as a defendant in two of the substantive counts against appellant, and with respect to the third—the only substantive count charging both Altvare and appellant—the jury acquitted Altvare.[17] A fair analysis of the entire record leads assuredly to the conviction that the error could at most have had but a very slight effect on the jury's verdict on the substantive counts.

The judgment on Count I is reversed; the judgments on Counts IV, V and VII are affirmed.

SWYGERT, Circuit Judge (dissenting in part).

Regretfully I cannot agree with the decision reached by the majority in affirming the defendant-appellant's convictions on the substantive counts. The trial judge, in my opinion, committed an error which requires reversal in toto and a remand for a new trial. He either should have severed the defendant-appel-

---

16. Moreover, the proposed instruction was not a model of clarity. It read:

"The jury should give separate consideration not only to what each defendant may have said or done, but also to what unlawful plan or purpose may have been intended. The jury may find that no conspiracy existed, but may also find from the evidence that one or more separate conspiracies were formed. Two conspiracies may have certain members in common and may also share similar means of accomplishing the goals agreed upon, but if the jury finds separate purposes it must also find separate conspiracies. No acts done or statements made by other persons after the formation of a conspiracy should be considered by you unless you are satisfied beyond a reasonable doubt that both persons participated with a common intention to advance a common object.

or purpose. Participation in separate conspiracies should only be considered separately with regard to the members of each conspiracy." (R. 2).

The record does not include a transcript of the conference on instructions; therefore, the nature of appellant's objections to the government's proposed instructions and the reasons why no alternate was given are not indicated by the record. The error would, of course, not have been preserved if it were not plain.

17. This acquittal of Altvare certainly minimized any legitimate concern that Johnson's conviction on that count was merely an unthinking reaction to a "gestalt"—particularly since the inadmissible evidence related to criminal behavior of Altvare without even mentioning Johnson. Moreover, were there substance to the gestalt theory, it seems unlikely that Getty,

lant from the trial at the close of the Government's case after being requested to do so, or he should have given a cautionary instruction covering the evidence of the conspiracy with which Johnson had no connection.

As Judge Stevens demonstrates, the record clearly indicates there were two separate conspiracies, one involving Joseph Altvare, Judy Altvare, Gerald Altier, Adam Jung, Kenneth Getty, and Louis Solone in receiving and selling stolen motor vehicles moving interstate and a second involving only Joseph Altvare and Cecil Ray Johnson in receiving three different stolen motor vehicles. Since the indictment charged a single overall conspiracy among all the defendants and the case was tried on that basis, the court holds that the conviction of Johnson of the conspiracy cannot stand absent a cautionary instruction clearly delineating the two conspiracies and admonishing the jury not to apply evidence relating to one when considering the other. In respect to the substantive counts relating to Johnson, the majority holds that the evidence concerning the conspiracy with which Johnson was not involved did not spill over and taint the finding of guilt on those counts. I disagree.

Laying aside for the moment the question of prejudice and how it should be appraised, there is no question that there was a spillover. The spillover about which we are talking can best be demonstrated, I believe, by graphic illustrations, one when a single conspiracy is charged together with substantive counts and the other when, although a single conspiracy is charged along with substantive counts, two conspiracies are ac-

tually shown by the evidence, that is, this case.

*Illustration I*

In Illustration I a cautionary instruction telling the jury not to consider the evidence of the conspiracy when considering the substantive counts is unnecessary because the conspiracy evidence is relevant to the execution of the object of the conspiracy. A and B are engaged in a joint enterprise growing out of the conspiracy if they act together, or B and C are aiders and abettors conceptually, also the result of the conspiracy, if A acts alone. *Cf.* Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In Illustration II a problem arises because the evidence relating to Conspiracy I does not have a joint enterprise or aider and abettor relationship with the substantive charges growing out of Conspiracy II. That re-

---

Solone, and Mrs. Altvare—each of whom was more closely associated with Altvare than was Johnson—would have been acquitted. In all events, it may be useful to note that our holding does not rely merely on our appraisal of Johnson's guilt. We are simply convinced, under the *Kotteakos* test, that the evidence de-

tailed in n. 12, *supra*, added so little—if indeed anything at all—to the convincing proof that Johnson must have realized that the three Cadillacs made available to him by an unconventional source and at bargain prices were stolen, that the error was harmless.

lationship exists only with respect to the evidence relating to Conspiracy II.

Since the jurors in the case at bar heard evidence involving a conspiracy in which Johnson had no part, an impermissible spillover resulted as to the substantive crimes charged against him. The critical question then arises as to its prejudicial effect on the jury and what should have been done about it. Before dealing with the quantum of the prejudice emanating from the circumstances of this case, I shall first discuss what should have been done. Two courses were open to the trial judge. He could have granted a severance at the close of the Government's evidence or he could have given a cautionary instruction. He did neither. As to severance the Government should have known at the close of its evidence what it readily concedes now: that it had proved two separate conspiracies instead of one. The trial judge should have known it also because it was brought to his attention by the defendant's motion for severance.

But short of granting severance the judge had a duty to admonish the jury during his charge that it should disregard the evidence of the larger conspiracy in deciding the guilt or innocence of the defendant as to the substantive charges. Instead he gave the standard instruction covering the co-conspirator exception to the hearsay rule and then in discussing the substantive counts he merely told the jurors:

Upon retiring—first of all, multiple defendants have been charged with separate crimes in each of the various counts of the indictment. You should give separate consideration and render separate verdicts with respect to each defendant and as to each count. Each defendant is entitled to have his guilt or innocence determined as to each of the crimes charged from his own conduct and from the evidence which applies to him as if he were being tried alone.

The latter instruction was totally inadequate to meet the problem which the irrelevant evidence and co-conspirator instruction presented.

The court holds that the trial judge should have told the jury not to use the evidence of one conspiracy when considering the existence of the other conspiracy. Given that holding, for exactly the same reasons a cautionary instruction was required to neutralize, if possible, the prejudicial effect of the extraneous evidence on the substantive charges against Johnson.

There is precedential authority for the position I advance. In United States v. Bentvena, 319 F.2d 916 (1963), thirteen defendants were charged and tried for conspiracy. Three were additionally charged with substantive offenses. The defendants, including the three charged with substantive offenses, were convicted on all counts. The Second Circuit reversed the conviction of the three not only because of lack of evidence as to their participation in the conspiracy but also because of the lack of a cautionary instruction with respect to the substantive counts. There the court said: "Proper cautionary instructions . . . can presumably limit the prejudicial effect of the evidence presented at the trial directed towards proof of the conspiracy." 319 F.2d at 955. The court concluded: "The jury charged with that duty could hardly have given their defense the same consideration after they were erroneously found to be narcotics conspirators as it would have had they been tried on the substantive counts alone. The mass of conspiracy evidence militated against their credibility and towards their guilt." 319 F.2d at 955.

The obverse situation existed in Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). There seven defendants were charged with conspiracy. Three substantive counts were added to the conspiracy count charging various defendants with being the three main perpetrators of a scheme to transport stolen goods. The conspiracy count was dismissed at the close of the Government's case for failure of proof. The

case was submitted to the jury on the substantive counts and a conviction resulted. The Second Circuit upheld the convictions, and the Supreme Court affirmed by a five-to-four majority. The Court noted, however, that:

> The case was submitted to the jury on each of these counts, and under a charge which was characterized by petitioners' counsel as being "extremely fair." This charge meticulously set out separately the evidence as to each of the petitioners and admonished the jury that they were "not to take into consideration any proof against one defendant and apply it by inference or otherwise to any other defendant." 362 U.S. at 515, 80 S.Ct. at 948.

Moreover, Mr. Justice Clark, speaking for the majority, recognized the possible prejudice and the need for a trial judge to consider a severance:

> It appears that not only was no prejudice shown, but both the trial court and the Court of Appeals affirmatively found that none was present. We cannot say to the contrary on this record. Nor can we fashion a hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law. We do emphasize, however, that, in such a situation, the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear. And where, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice. 362 U.S. at 516, 80 S.Ct. at 948.

Thus Schaffer v. United States and United States v. Bentvena stand for the proposition that a cautionary instruction was required in the circumstances of the case before us.

For guidance in measuring the prejudice visited on the defendant Johnson, we must look to Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). There Mr. Justice Rutledge wrote extensively, in a different but analogous context, about prejudice emanating from inadmissible evidence, harmless error, and the function of appellate review. I quote in part:

> Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. Weiler v. United States, *supra,* 323 U.S. [606] at page 611 [65 S.Ct. 548, at page 551, 89 L.Ed. 495]; Bollenbach v. United States, 326 U.S. 607, 613, 614 [66 S.Ct. 402, 405, 406, 90 L.Ed. 350]. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error. Weiler v. United States, *supra;* Bollenbach v. United States, *supra.*

> But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. Cf. United States v. Socony-Vacuum Oil Co., *supra,* 310 U.S. [150] at pages 239, 242 [60 S.Ct. 811, at pages 851, 853, 84 L.Ed. 1129]. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. Cf. United States v. Socony-Vacuum Oil Co., *supra,* 310 U.S. at pages 239, 242

[60 S.Ct. 811, at pages 851, 853]; Bollenbach v. United States, *supra*, 326 U.S. 614 [66 S.Ct. 402, 406].

This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. Bruno v. United States, *supra*, 308 U.S. [287] at page 294 [60 S.Ct. 198, at page 200, 84 L.Ed. 257]. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. 328 U.S. at 763–65, 66 S.Ct. at 1247–1248 (footnotes omitted).

There is no doubt that a large part of the total evidence submitted to the jury dealt with the conspiracy with which Johnson was not involved. For substantiation I need only refer to footnote 12 of Judge Stevens' opinion wherein he quotes from the Government's recital of that evidence. (It is important to note Judge Stevens' preface to the footnote: "A major part of the facts in the government brief summarized evidence which was not admissible against appellant, but which, under the court's instructions, the jury may have considered in finding him guilty of conspiracy.") On the other hand, the Government's evidence which pointed to Johnson's guilt of receiving three stolen automobiles and selling two of them, although disputed, could fully support a verdict of guilty if that evidence were considered independently. The trouble is that it is highly probable that it was not considered independently by the jury.

The bulk of the evidence dealt with the larger of the two conspiracies. As the case was tried on a single conspiracy theory, all phases of that alleged conspiracy were lumped together. The mass of evidence concerning unrelated criminal activities of others, especially Joseph Altvare, may have influenced the jury's decision that Johnson had knowledge of the fact that these automobiles were stolen. The instruction that the statements and acts of one defendant as a conspirator could be imputed to the other conspirators no doubt also helped to produce in the minds of the jurors a gestalt in which the substantive charges against Johnson were inextricably blended with the two conspiracies. Since neither the prosecution nor the judge did anything to disentangle the substantive charges from the mass of evidence—most of it totally irrelevant to those charges—so that they could be considered independently, there is little likelihood that they were so considered.

In this situation we should apply the criteria and admonitions contained in the quotation from Kotteakos v. United States. As appellate judges we might with justification decide from the record that the defendant was guilty. But that, as pointed out by Mr. Justice Rutledge, is not our function. Rather we must ask ourselves: Can we say with conviction that the jurors would not have decided differently had they not been subjected to the confusion which resulted from the way the indictment was drawn and the case was tried? I, as a member of the panel, do not have a firm conviction either way; admittedly,

I find the question fraught with difficulty.

But of equal importance is the observance of form as it relates to substance. Unless we are indeed confident that a trial error was harmless, should we not insist that criminal trials be conducted so as not to be faced with that perennial hard question: Does the end justify the means? If procedural requirements are waived simply because we as appellate judges believe from an examination of the record that a defendant *is* guilty in fact, then the safeguards erected for fair trials crumble swiftly.

Judge Stevens indicates that any harm done the defendant by the circumstances here was harmless. Judge Hastings concurs. I respectfully do not agree for the reasons I have stated.