UNITED STATES of America, Plaintiff-Appellee,

v.

Luttetus PERRY, a/k/a Ted Perry, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Warren Stephen BRADLEY, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Theodore WARE, a/k/a "Teed" a/k/a "Fish", Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Brian WINTERS, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Michael Burke ERWIN, Defendant-Appellant.

Nos. 75–3737, 75–3743, 75–3738, 76–1314 and 75–3662.

United States Court of Appeals, Ninth Circuit.

March 22, 1977.

Rehearings and Rehearing En Banc Denied April 7, 1977.

Stephen W. Peterson, Asst. U. S. Atty., argued, San Diego, Cal., for plaintiff-appellee.

Edward F. Bell, argued, Bell, Gage, McSorley & Hudson, Detroit, Mich., for appellant Perry.

Howard J. Bechefsky, argued, San Diego, Cal., for appellant Ware.

Gary Ellingson, argued, San Diego, Cal., for appellant Bradley.

James N. Pendleton, argued, San Diego, Cal., for appellant Winters.

Before ELY and ANDERSON, Circuit Judges, and SOLOMON,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

On August 15, 1975, the Federal Grand Jury for the Southern District of California returned a criminal indictment charging defendants and nine others with conspiracy to illegally import heroin and cocaine (Count One), and conspiracy to possess heroin and cocaine with intent to distribute (Count

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

Two). [21 U.S.C. 952, 960, 963, 841(a)(1) and 846].

Defendants Perry, Bradley, Ware and Winters proceeded to jury trial on October 7, 1975. Defendant Erwin waived his right to a jury trial and his case was heard by the court. At the close of the government's case the defendants moved for acquittal. The trial court granted the motion as to Count One only.

On October 31, 1975, the jury found defendants guilty on Count Two. On November 3, 1975, the trial court found defendant Erwin guilty on Count Two.

Defendants appeal their convictions, raising numerous issues to be discussed *infra*. Jurisdiction rests with 28 U.S.C. 1291 and 1294. We affirm as to all defendants.

Briefly, the evidence, viewed favorably to the government, shows that all of these defendants were involved in a complex and sophisticated operation involving smuggling and distribution of illegal narcotics, primarily heroin and cocaine. The narcotics originated in Mexico under the control of one Raul Leon-Aispuro. Couriers of Aispuro would then smuggle the narcotics across the border into the United States, usually Southern California. The narcotics would then be delivered to the defendants or delivered to one Edward Perry (cousin of defendant Perry), who acted as warehouseman, wholesaler and distributor. The defendants in this case played the role of satellite retailers in this operation. Some were located in different parts of the country. They obtained the narcotics either from Edward Perry himself or from couriers working for him. Other relevant facts will be presented as they relate to the issues raised.

## I. VOIR DIRE OF THE JURY

During the jury selection process and after prospective jurors had been sworn, the trial court inquired of the jurors whether they would be able to follow his instructions on the law that was to govern. Juror Johnston expressed that while he would be willing to follow the law, he had already formed an opinion in the case. He felt this way from reading his morning paper and overhearing a conversation between two young ladies. When this juror expressed to the court that he felt he could not fairly try the case, he was dismissed.

Out of the presence of the jury, defense counsel requested that the court inquire of all the jurors whether they had heard any comments or remarks along those lines and, if so, what impact it would have on them as jurors.

The court responded:

"I don't propose to do that gentlemen. I think that would be making a mountain out of a molehill. I have asked them about whether they could be fair and impartial and whether they were willing to have their own case tried by jurors in the same frame of mind that they are now in. I think it would emphasize the situation and be very detrimental rather than beneficial. I think you are better off, all of us are, if we just act as if that had not happened." (R.T. 49–50).

Later, just as the jury was being excused for the day, Juror Zubricky mentioned to the court that he had overheard a man talking in the hall. Zubricky was questioned in chambers out of the presence of the jury. When asked if he had been talking to the previously-excused juror, he said no, but that he had been talking to another juror on the panel, a Barbara Van Dorn. Zubricky stated that he had "whispered" to Van Dorn that he had a daughter hooked on marijuana and that he hoped he wouldn't be picked for the jury because he "was not in favor of it at all." (R.T. 52). Zubricky stated that Van Dorn made no response, but was only listening. Zubricky was then released for cause. Defense counsel again requested that the court inquire of the jurors whether they had discussed the case or formed an opinion of the case based on anything said that day. The court refused because he didn't feel there was any reason for it. He also refused to give defense an additional peremptory challenge with which to challenge Juror Van Dorn.

■ Defendants[1] now contend on appeal that the trial court committed reversible error by not making further inquiry of the jury, especially Juror Van Dorn, or giving the defense an additional peremptory challenge. Defendants also contend that the trial court erred by refusing to grant defendants' motion for a mistrial.

■ We find no reversible error committed by the trial judge in his handling of the voir dire of the jury. As this court stated in *United States v. Silverthorne*, 430 F.2d 675, 678 (9th Cir. 1970), *cert. den.*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971):

> "Appellate courts will not interfere with the manner in which the trial court conducted the *voir dire* examination unless there has been a clear abuse of discretion."

*See also Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). We find no such abuse of discretion in this case which, it should be noted, does not involve substantial pretrial publicity. *Compare United States v. Silverthorne, supra,* with *United States v. Polizzi*, 500 F.2d 856, (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). The trial court went to the lengths necessary to provide a fair and impartial jury. He is the one closest to the situation and can best evaluate the proper method to determine if there is any bias or preconceived opinions held by the jury. He is best able to walk that fine line between first questioning the jury to find bias and then later specifically requestioning the jury to the extent that confusion and bias are *created* in the jury by suggesting the existence of controversial issues which may or may not exist. *See United States v. Polizzi, supra,* at 880. The record reflects that any possibility of bias or partiality on the part of any juror is at best speculative. Initially, the court properly declined to inquire of the remaining members of the jury panel whether they also overheard the ambiguous conversation alluded to by Mr. Johnston. Johnston's comment had been made in open court before the jury panel, yet failed to evoke similar reactions from others. To delve into the possibility that others might have overheard the conversation would have been a fishing expedition that would have suggested to the panel the presence of highly prejudicial information. Mr. Zubricky's subsequent comments added nothing to what the trial judge already knew about the incident in the hallway; hence, he quite appropriately maintained his opinion that no significant event of pretrial publicity had occurred. Moreover, we do not believe that the court was obligated to bring Juror Van Dorn into chambers and inquire whether she formed an opinion based upon what Zubricky had said to her. The reference to his daughter's use of marijuana did not relate to an opinion as to guilt or innocence of the defendants, but rather only concerned a personal problem unfortunately shared, perhaps, by many parents.

Thus, the trial court properly exercised his discretion in questioning the jury and denying the motion for a mistrial. The appellants were not deprived of a fair trial because of the situation presented on this record.

## II. SUFFICIENCY OF THE EVIDENCE

■ Defendants contend that the evidence produced at trial was insufficient to establish that they participated in the single conspiracy charged in the indictment. They argue that the government has not shown that each of the defendants worked directly with each other nor even shown that all of the defendants knew each other. However, under the law of this circuit such a showing is not necessary. The government is not required to show direct contact or explicit agreement between the defendants. For the convictions to stand, the government must produce enough evidence to show that each defendant knew *or had reason to know* the scope of the distribution and retail or-

---

1. Erwin lacks standing to challenge any alleged errors relating to the jury since he waived trial by jury.

ganization involved with the illegal narcotics, and had reason to believe that their own benefits derived from the operation were dependent upon the success of the entire venture.

The instant case closely parallels *United States v. Baxter,* 492 F.2d 150 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). In *Baxter,* we dealt with a factual situation very similar to the instant case; that is, a large narcotics smuggling and distribution organization. There, as here, defendants were the retail end of the chain and they also contended that the evidence was insufficient to establish that the individual defendants participated in an overall conspiracy as charged in the indictment. In answer to this claim, we specifically stated:

". . . the Government did not, for the most part, prove direct contact and connivance between the defendant retailers. However, even though the defendant retailers did not directly conspire with each other in this over-all undertaking, if each knew, or had reason to know, that other retailers were involved with the Hernandez organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury could find that each had, in effect, agreed to participate in the over-all scheme. [citations omitted] This would be true even though the individual defendants were not aware of the identity, number or location of the other participating retailers."

492 F.2d at 158.

■ Upon complete review of the record in this case, we find that the jury (and the trial judge in Erwin's case) could rationally conclude that there was a general conspiracy as charged in the indictment. Once a conspiracy has been found to exist, only slight evidence is necessary to connect a defendant to it. *United States v. See,* 505 F.2d 845 (9th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); *United States v. Knight,* 416 F.2d 1181, 1184 (9th Cir. 1969).

■ When we view the evidence in the light most favorable to the government, as we must, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we find that it is amply sufficient to show that defendants were members of the general conspiracy charged in the indictment. For example, the record discloses that defendant Perry was a major narcotics trafficker in the Detroit, Michigan, area. On at least two different occasions defendant Perry accepted deliveries of narcotics from Edward Perry and once argued the method of payment for the narcotics over the telephone. He also personally contacted and met with Edward Perry on several different occasions.

As for defendant Bradley, the evidence sufficiently establishes that he was a prime member of the conspiracy. He was a courier of narcotics. He delivered them at least once to Salt Lake City. The record also discloses that Bradley twice accepted delivery of narcotics from another courier who was working for the Aispuro organization in Mexico, and, for a part of the time, he was a partner with wholesaler Edward Perry in the narcotics business.

The evidence also connects defendant Ware to the conspiracy and to Edward Perry. On several different occasions narcotics were delivered to Ware by couriers of Edward Perry or by Edward Perry himself. Some of these were on "consignment" which indicates that Ware was a trusted retail outlet and received these drugs for resale after which he would repay Edward Perry for the narcotics. One time Ware couldn't come up with the money for previously-supplied narcotics. While Edward Perry was upset with Ware for not having the money, he agreed to supply Ware with some more heroin to enable Ware to make up the debt from his profit on future sales.

The evidence is also sufficient to connect defendants Winters and Erwin to the conspiracy. Both in effect concede that ap-

proximately one pound of cocaine was delivered to them by a courier of Edward Perry.[2] While Winters argues that no narcotics were ever delivered directly to him and that he did not reside with Erwin, the testimony showed that Elise Williams and Edward Larry Jackson delivered the cocaine to Erwin's house while Winters was present. They all four snorted some of this cocaine. (R.T. 509 and R.T. 652)

Even though Winters may not have resided at the same address as Erwin, Williams and Jackson throughout their testimony say that they delivered the cocaine to "Mike and Brian" (Mike Erwin and Brian Winters) at the home of "Mike and Brian." A strong inference arises that both Winters and Erwin were the recipients of the cocaine package. This inference is corroborated throughout Williams' and Jackson's testimony. For example, one time when Ed Perry (the supplier of the cocaine) and Jackson got together, they talked about the package Jackson had taken up to "Mike and Brian's." Perry told Jackson he was waiting for some confirmation back "as to whether some money had been gotten for it [the package] or not." (R.T. 656).

This package of cocaine was found to be of inferior quality and unsalable and was returned to Ed ˙ Perry. After its return, Winters and Erwin came down to Ed Perry's La Jolla house and stayed for two days, apparently waiting to see what was going to happen with this bad package of cocaine. The other co-conspirators (apparently not Winters and Erwin) were to lose their $12,000 investment on this bad package. These other conspirators decided that the loss would have to be made up from future narcotics transactions. It may be legitimately inferred as argued by the government that Winters and Erwin were "preferred customers who had been trusted with the narcotics initially" without being required to "front" any money to obtain the narcotics for resale. (Government brief, p. 55) There was a discussion between Winters, Erwin, Ed Perry and Jackson about the package "not being up to par." (R.T. 657). While Winters participated "very little, if any, concerning narcotics," (R.T. 659), the fact is he was still present.

With Winters and Erwin together and present every time this bad package of cocaine popped up, there is a very strong

---

2. Winters and Erwin were indicted for the conspiracy because Elise Williams had delivered approximately one pound of cocaine to them. At page 8 of their opening brief they make this statement:

"In the instant case, *Appellants concede that their participation could inferentially establish that they had conspired with Edward Perry.* However, it would be unreasonable to hold that either one of them had knowledge of a conspiracy broader in scope than their individual participation. *Appellants' participation is limited to possessing a substance which was never established as being contraband* (R.T. 841). Testimony regarding the nature of the substance may present cause for suspicion or conjecture that appellants were illegally involved in a conspiracy to possess controlled substances, but it was equivocal." (emphasis supplied)

We read this paragraph to mean that they conceded delivery of the cocaine, but argued that even so, this would not establish that they knew the breadth of the conspiracy charged in Count Two.

We also read it to say in effect:

"While we concede delivery of a substance there is no proof that it was cocaine."

Throughout the remaining portion of their brief, they did not argue that there was no delivery, rather they argued that they were not part of the overall conspiracy because they allegedly did not know where Ed Perry got his drugs or who else was involved with Perry. This cocaine was weak, of inferior quality, and could not be sold so it was returned to Ed Perry. Again, at page 8 of Winters' and Erwin's brief, they state:

"Appellants' act of returning the substance is not consistent with the alleged object of the conspiracy to possess with intent to distribute cocaine."

Winters claims at page 12 of his brief that he "never had actual or constructive dominion and control over the substance" at either Erwin's or Perry's home. We question how he can argue the effect of returning something, at the same time claiming he never received it or possessed it.

In any event, both were convicted of *conspiracy to possess* with intent to distribute cocaine, not with possession and distribution. (Emphasis supplied)

inference that both Winters and Erwin had an interest in it. The jury (and the court in Erwin's case) could easily infer that both knew what was going on and that the bad package of cocaine was only returned when Winters and Erwin, as sellers for Ed Perry, could not get their buyers to accept it. Therefore, they had to return it to Ed Perry, their supplier.

Winters and Erwin were also seen at a party where several of the major figures in the overall conspiracy were present, including Ed Perry and defendant Perry.[3]

With this and the other evidence presented at trial, it is clear that this is more than sufficient evidence to connect Winters and Erwin to the conspiracy.

## III. VARIANCE

█ Defendants contend that the proof at trial showed several conspiracies rather than the one conspiracy charged in the indictment. They argue that this is a variance which prejudiced their substantial rights and requires reversal. We disagree. Because we have found, after a reading of the record in this case, that the jury could rationally conclude that there was one general conspiracy and that defendants were members of it, we find that there is no variance between the indictment and the proof adduced at trial which prejudiced defendants' rights. *United States v. Baxter, supra*, p. 160.

Defendants rely on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). However, the instant case is quite different from the facts which exist in *Kotteakos*. There, thirty-two persons were indicted for a single conspiracy to violate the National Housing Act by inducing lending institutions to make loans which could be offered to the Federal Housing Administration for insurance on the basis of false and fraudulent information. The evidence proved at least eight different conspiracies consisting of several defendants whose only connection with each other was that all had their fraudulent applications handled by a broker named Brown. Each of these agreements with Brown was a completely separate agreement and had its own distinct illegal end. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. This is different from the instant case in that here the jury could find that each one of the defendants knew or should have known that other retailers were involved and that each had reason to believe that what benefits he received were probably dependent upon the success of the entire venture. *United States v. Baxter, supra*. The retailer defendants here are much more interested and involved in the general conspiracy than those defendants in *Kotteakos, supra*. For these reasons, we also distinguish *United States v. Griffin*, 464 F.2d 1352 (9th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302 (1972).

## IV. REBUTTAL TESTIMONY

One of the key witnesses for the prosecution was June Delores Wright. She was a co-conspirator and primarily acted as couri-

---

**3.** There is other evidence from Jackson's testimony to connect Winters and Erwin to the overall conspiracy. (R.T. 687–688):

"Q: Where was the first time you saw this person named Carlos?
A: In the Ingram downstairs apartment. [an apartment rented by Ed Perry (R.T. 677)]
* * * * * *
Q: In whose presence was Mr. Carlos when you first saw him?
A: In Ed Perry's, Mike, Brian and myself.
* * * * * *
Q: Can you tell us who said what?
A: Ed Perry said that this guy Carlos was capable of getting a connection in Peru and having cocaine . . . brought back and he was going to finance it.
Q: Mike and Brian were there on that occasion?
A: Yes.
Q: Did they take part in the conversation?
A: Not really, but Perry did all the talking. *They had brought Carlos down with them.* (emphasis supplied)
Q: Mike and Brian had?
A: Yes."

Jackson saw these people, Ed Perry, Carlos, Mike and Brian together at a later time also. However, this time they were discussing opening a Mexican restaurant. (R.T. 689).

er of narcotics for Edward Perry. She took the stand and testified about her own and defendants' involvement in the conspiracy. She also testified as to several collateral matters such as her occupation, her residence and who her relatives were. The defense then presented several inconsistencies in her testimony on these collateral matters. The trial court allowed the prosecution to put Wright back on the stand as a rebuttal witness where she "clarified" the inconsistencies which had been presented.

Defendants contend that Wright's rebuttal testimony was improper and that the trial court abused his discretion by allowing her to retake the stand. We disagree. The extent to which counteracting and rehabilitative evidence may be received after the credibility of a witness has been attacked is a matter in which the trial judge necessarily has broad discretion. *Beck v. United States*, 317 F.2d 865, 870 (5th Cir. 1963), *cert. denied*, 375 U.S. 972, 84 S.Ct. 480, 11 L.Ed.2d 419 (1964). The key issue in this instance is the credibility of Witness Wright. If, during rebuttal testimony on the stand, she were to change parts of her earlier testimony (which is what the defense is contending), this would reflect on her credibility, which is one of the ultimate questions for the jury to decide. Defendants' counsel were allowed great latitude in their cross-examination of Witness Wright into collateral matters. We cannot find that any of the defendants were prejudiced because she was allowed to take the stand in rebuttal. This was no abuse of discretion by the trial court. Federal Evidence Rules, 104(e) and 611(a)(1).

The contention that the prosecution participated in a ruse to fabricate Wright's testimony, or failed to disclose the falsity of testimony known to it, is not supported by the record.

## V. NONDISCLOSURE OF THE IDENTITY OF WITNESS LARRY JACKSON'S FRIENDS

During direct examination of co-conspirator and government witness Lar-

ry Jackson, he mentioned that friends of defendant Ware, Ware's wife, and Jackson sometimes stopped by the house and consumed narcotics. On cross-examination, counsel for the defense demanded that Jackson reveal the names of these friends. The trial court ruled that Jackson did not have to reveal the names because they were irrelevant. Defendants contend that they have been denied their right to confrontation of witnesses against them. However, this right necessarily only extends to issues which are relevant to the trial at hand. The trial court is the one best able to determine whether the evidence is relevant or whether counsel is merely fishing amidst the irrelevant evidence hoping to find something of relevance. It is well-established that the scope and extent of cross-examination is within the trial court's sound discretion. *United States v. Bagsby*, 489 F.2d 725 (9th Cir. 1973). We find that the identity of Jackson's friends was of questionable relevance and that the trial court properly exercised his discretion in limiting cross-examination in this area.

## VI. JURY INSTRUCTIONS

Defendants contend that the proof at trial showed multiple conspiracies, while the indictment only charged one general conspiracy. The trial court instructed the jury on the usual conspiracy instructions to the effect that the conspiracy offense is complete when the jury finds beyond a reasonable doubt that the conspiracy existed, that there was an overt act, and that the defendants were willing members of it. The trial court refused to give defendant Perry's requested instruction which read:

> ". . . if you should find from the proofs in this case that there are two or more disconnected conspiracies, you must not find the defendants in this case guilty of the conspiracy charged in the indictment." (Clerk's Transcript, p. 30)

We find that this multiple conspiracy instruction incorrectly states the law and the trial court, therefore, properly refused it. The crucial point that defend-

ants miss in this case is the fact that the jury could find that there were several different agreements involving the defendants, all of which would then connect the defendants to the general overall conspiracy as charged in the indictment. The government does not have to prove that all of the defendants met together at the same time and ratified the illegal scheme. This just is not the nature of a conspiracy, especially a large narcotics smuggling and distribution organization as we have here. Generally, the defendants are going to meet and conspire in twos or threes in order to carry out the design of the common overall scheme. To suggest that defendants should be acquitted of the general conspiracy charge just because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy. By these separate agreements the defendants became parties to the larger common plan, joined together by their knowledge of its essential features and scope, though not of the exact limits, and by their single goal. These agreements were merely steps in the formation of the larger and more general conspiracy. *See Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

We do not mean to suggest that a *correct* instruction on multiple conspiracies would be improper in this and similar cases. When the possibility of a variance appears between the indictment and the trial proof, the trial court should instruct the jury on multiple conspiracies. *United States v. Varelli*, 407 F.2d 735, 746 (7th Cir. 1969). *See, e. g. United States v. Griffin*, *supra*. However, because of our finding, *supra*, that there is no such variance in the instant case, the failure of the trial court to instruct on multiple conspiracies caused no harm or prejudice to the defendants and, as such, is not reversible error.

Other contentions raised by defendants have been studied and we find them to be without merit.

AFFIRMED.