**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ibrahim ABUSHI, Mahmud A. Ghanem,**
**Mohammed Eid Awad, and Muti**
**Shuman, Defendants-Appellants.**

**Nos. 81–1030 to 81–1033.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 17, 1981.

Decided June 8, 1982.

Martin A. Nakahara, Oakland, Cal., for Abushi.

Alan Dressler, San Francisco, Cal., argued, for Ghanem, Awad, Shuman; Christine E. Sinnott, San Francisco, Cal., on brief.

Joseph M. Burton, Asst. U. S. Atty., San Francisco, Cal., for U. S. A.

Before KILKENNY, WALLACE and SNEED, Circuit Judges.

WALLACE, Circuit Judge:

Appellants Abushi, Awad, Ghanem, Shuman, and seven others were indicted on charges of conspiracy to defraud the United States through the illegal redemption of food stamp coupons in violation of 18 U.S.C. § 371, and the illegal acquisition and redemption of food stamp coupons in violation of 7 U.S.C. § 2024(b), (c). Appellants were tried jointly, convicted by a jury, and sentenced to imprisonment for terms ranging from six months to five years plus various fines. On appeal, they raise issues involving the sufficiency of the evidence supporting their conspiracy convictions, the district court's denial of their motion for misjoinder under Fed.R.Crim.P. 8(b) and severance under Fed.R.Crim.P. 14, their entitlement to a judgment of acquittal on the ground of entrapment, and the propriety of various jury instructions. We affirm.

I

In April of 1978, special agents of the Agriculture Department began an investigation into illegal food stamp trafficking[1] at Reno's Liquor in San Francisco, California. Reno's Liquor is owned by Ghanem. His two brothers, one of whom is appellant Awad, run the store for him. Between April 4, 1978 and May 6, 1978, Special Agents Lee and Cotton sold various amounts of food stamps for cash at Reno's Liquor. The purchasers of these food stamps were Ghanem's two brothers.

Approximately one year later, on April 19, 1979, Lee and Cotton visited Reno's Liquor and discussed with Awad the sale of $10,000 worth of food stamps. Arrangements were made for Awad to meet the agents later that evening. Without the agents' knowledge, Awad arranged for Ghanem and Shuman to attend the meeting. During the meeting, Ghanem negoti-

---

[1] The term "illegal food stamp trafficking" is a shorthand reference to the transfer of food stamps outside the guidelines of the Food Stamp Act of 1977. Under the Food Stamp program, low income families receive a monthly allotment of food stamps which can be used to purchase eligible food items from authorized retail stores. Recipients cannot exchange their food stamps for ineligible products. Authorized retailers may redeem food stamp coupons at a local bank. Transfer of food stamps between authorized retail stores is prohibited, as is the redemption of food stamps by a retail store which did not initially receive the coupons in exchange for eligible food items.

ated with Cotton for the purchase of $10,-000 in food stamps for $3,000 in cash.

On April 23, 1979, Cotton again met with Ghanem and Shuman at the Third World Market, a store owned by Ghanem, to discuss the sale of $24,000 worth of food stamps. Cotton testified that he asked Ghanem for a better price than the 30% that he had previously received. Ghanem stated that he had to send the food stamps to New York in order to redeem them and thus had to allow for travel expenses and a profit for his confederates in New York. After purchasing the food stamps for $7,200 in cash, Ghanem informed Cotton that he was leaving San Francisco for some time and that in his absence Cotton should contact Shuman.

During August and September of 1979, special agents of the Agriculture Department sold food stamps to Abushi for cash on five separate occasions at Abushi's store, Russ's Liquors, located in Oakland, California. The largest transaction involved $19,-500 in food stamps for $6,000 in cash. During the negotiations for this sale, the special agent indicated dissatisfaction with the price offered by Abushi. Abushi explained to the agent that the low figure was due to the fact that he had to go through other people to redeem the stamps since he could not redeem them through his own store. Abushi had previously lost his authorization to redeem food stamps at Russ's Liquor as a result of an investigation by the Department of Agriculture.

In all the transactions described above, the special agents had treated the food stamps in a manner which would make their identification possible after redemption. An analysis of the food stamps recovered from these transactions indicated that of the $10,000 in food stamps purchased by Ghanem on April 19, 1979, approximately $2,000 were redeemed through Turk Street Market, which was owned by Shuman, and $2,600 were redeemed through Reno's Liquor. Of the $24,000 in food stamps purchased by Ghanem on April 23, 1979, approximately $7,000 were redeemed at Super Save Market, which was owned by co-de-

fendants Arikat and Erakat, and $15,000 were redeemed through several Arab-owned stores in New York. Of the $10,000 in food stamps purchased by Abushi on September 14, 1979, approximately $3,500 were redeemed at Super Save Market and $3,100 were redeemed at Haight Street Liquor, a store owned by co-defendant Lufti Abbushi.

On the morning of January 31, 1980, Abushi was brought to an apartment in San Francisco by Kern, an undercover officer who had previously sold him food stamps, to negotiate the purchase of $100,000 worth of food stamps from a third party. After Abushi offered to pay $30,000, co-defendant Arikat arrived at the apartment with a second agent. Arikat had also been told that there was a third party who wished to sell $100,000 in food stamps. Neither Arikat nor Abushi had been advised of the other's existence or of any other potential purchasers of the food stamps. After Arikat arrived at the apartment, Kern stated that he was looking for the best price. Kern testified that after Abushi and Arikat spoke in Arabic, Arikat stated that they would buy the stamps together for $30,000. Immediately after Arikat made that statement, Ghanem arrived with Cotton. Ghanem had also been informed that he was to meet and negotiate with a person interested in selling $100,000 worth of food stamps. He, too, was made to believe that he would be the sole buyer of the food stamps. After Ghanem arrived at the apartment and introductions were made, the agent who had accompanied Arikat pretended to be upset over the fact that there were other buyers involved. Kern again stated that he was looking for the best price. At that time, Ghanem stated that "it's okay, we are cousins." After Abushi, Arikat, and Ghanem had a discussion in Arabic, the three agreed to purchase the food stamps jointly for $30,-000 in cash. The three left the meeting with the understanding that they would return with the money in the afternoon. Later, Ghanem and Abushi returned with only $23,000. Ghanem stated that "the other party couldn't get his money together and they had a hard time going store-to-

store to raise the money." After Ghanem and Abushi paid the $23,000, they were arrested.

## II

■ Awad, Ghanem, and Shuman contend that the evidence was insufficient to establish that they participated in the single conspiracy charged in the indictment. When reviewing the sufficiency of the evidence to support a criminal conviction, the critical inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Conspiracy is established when there is an agreement between two or more persons to engage in criminal activity, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense. *United States v. Friedman,* 593 F.2d 109, 115 (9th Cir. 1979).

■ Awad, Ghanem, and Shuman essentially argue that the government did not prove that each of them worked together to effectuate the charged criminal enterprise. But the government is not required to show direct contact or explicit agreement among them. "For the convictions to stand, the government must produce enough evidence to show that each defendant knew *or had reason to know* the scope of the [criminal enterprise], and had reason to believe that their own benefits derived from the operation were dependent upon the success of the entire venture." *United States v. Perry,* 550 F.2d 524, 528–29 (9th Cir.) (emphasis in original), *cert. denied,* 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977). An unlawful conspiracy may be proven by circumstantial evidence; no formal agreement is necessary. *United States v. Friedman, supra,* 593 F.2d at 115; *United States v. Camacho,* 528 F.2d 464, 469 (9th Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). An agreement constituting a conspiracy may be inferred from the acts of the parties. *Id.; United States v. Schroeder,* 433 F.2d 846, 849 n.3 (8th Cir. 1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 951, 28 L.Ed.2d 224 (1971). Once the existence of a conspiracy is established, "evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original).

■ Viewing the evidence in the light most favorable to the government, we hold that the jury could rationally have concluded beyond a reasonable doubt that there existed one conspiracy as charged in the indictment, and that the appellants were members of it. Awad and Shuman argue that there was no evidence that they were aware of what Ghanem would do with the stamps that he purchased, or that they had any interest in his success in purchasing and disposing of the stamps. They also contend there was no evidence that they were connected with Ghanem, outside of the fact that they were present when he purchased stamps from Lee and Cotton on April 19, 1979. As to this episode, they state that their mere presence, without more, is insufficient to show the necessary conspiratorial design. Ghanem joins Awad and Shuman in arguing that the record is devoid of evidence from which it could be inferred that they individually entered into a conspiracy with any other defendant. They maintain that "the government, by 'arranging' the purchases of food stamps by the various defendants, was the sole link between them." As they view the evidence, the government assigned undercover agents to each of three family groups, the Ghanem family, the Erakat family, and the Abushi family,[2] and each family individually pur-

2. Awad, Shuman, and Ghanem describe the three family groups as follows: Ghanem family consists of Ghanem, Awad, and Shuman; Erakat family consists of Erakat and Arikat; Abushi family consists of Abushi, Saeideh, R. Abushi, and L. Abbushi.

chased food stamps from the government agents without any cooperation among the three groups.

Awad, Ghanem, and Shuman's arguments find little support in the record. The only reason that Ghanem ultimately negotiated with Cotton and Lee on the night of April 19, 1979, was because Awad had arranged for he and Shuman to attend the meeting. The original discussion was between the agents and Awad at Reno's Liquor. It was reasonable for the jury to infer that Awad told his brother and Shuman about the agents' offer and that when Ghanem was negotiating with the agents he was doing so on behalf of the three of them. Shuman overlooks his participation in the April 23, 1979 purchase by Ghanem. The agents testified that Shuman brought the money which was used to purchase the food stamps and was identified by Ghanem as the person to be contacted while he was out of town. In their attempt to argue that the only link between the three families was the action of the government agents, Shuman, Awad, and Ghanem focus solely on the purchasing activities of the defendants. However, evidence concerning the redemption activities strongly supports an inference that the three were participating with the other defendants in an overall conspiracy to defraud the government through the purchase and redemption of illegally acquired food stamps.

The jury heard testimony that store redemptions of food stamps were monitored by the Food & Nutrition Service in order to provide a starting point for determining whether a particular store was participating in illegal food stamp transactions. It was reasonable for the jury to infer that appellants, as owners and operators of stores participating in the food stamp program, were aware of the fact that the Food & Nutrition Service monitored store redemptions and investigated stores which redeemed inordinately large amounts of food stamps in a given period. The jury heard testimony that Ghanem had justified his low prices on the fact that he had to ship the food stamps to New York in order to redeem them. They also heard a tape of the April 19, 1979 evening meeting during which Shuman said, "New York you can move million dollars .... Why don't you give them our number ... [it's] better because I'll be there all day." There was evidence presented to the jury that food stamps that Ghanem purchased on April 19 and April 23 were redeemed at stores owned by Shuman, co-defendants Arikat and Erakat, several Arab owned stores in New York, as well as his own store, Reno's Liquor, which was operated for him by Awad and another of his brothers.

It may be that certain isolated purchases were made individually, or in family groups, without the knowledge of others. There was sufficient evidence, however, from which the jury could reasonably conclude that there was an underlying agreement or understanding among the appellants and others to purchase and redeem food stamps, and that there was a network of cooperative stores through which they could spread out their redemptions and thereby avoid detection by the Food & Nutrition Service. Of importance in this record is the statement of Ghanem that the reason he and Abushi could only raise $23,000 to purchase the $100,000 in food stamps on January 31, 1980, was because he "had a hard time going store-to-store to raise the money." That members of each of the three supposedly unrelated family groups agreed within about an hour to purchase jointly $100,000 worth of allegedly stolen food stamps buttresses the inference that the appellants' prior purchases of food stamps were undertaken with the knowledge that there was a network of stores involved in the illegal redemption of food stamps, as well as the inference that the benefits ultimately derived from the purchase of those food stamps were dependent upon the success of this entire network.

Abushi's argument that the government failed to prove one overall conspiracy to which he could be linked is somewhat different, although the other appellants apparently joined in it. He argues that the only common link proven between him and Ghanem was that their separate and indepen-

dent purchases were redeemed at a common store, Super Save Market. Thus, he argues that the government proved at best, multiple, smaller and unconnected conspiracies, none of which were charged in the indictment. He contends that having the conspiracy erroneously tried as one overall conspiracy prejudiced him by associating him with others involved in criminal acts for which he was not responsible. *See, e.g., United States v. Friedman, supra,* 593 F.2d at 116–17; *United States v. Kearney,* 560 F.2d 1358, 1362–63 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977).

Abushi relies in part on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). There, thirty-two persons were indicted for a single conspiracy to violate the National Housing Act by procuring loans which could be offered to the Federal Housing Administration on the basis of false information. The evidence proved the existence of at least eight different conspiracies whose only connection with each other was the fact that each defendant had his fraudulent application handled by a broker named Brown. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own was successfully finalized. *See Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947) (discussing *Kotteakos* ). The Court reversed the convictions on the ground that the variance between the indictment and the proof affected the substantial rights of the parties.

Abushi contends that like the defendants in *Kotteakos,* his redemption of food stamps at Super Save Market or any other store did not constitute an act in furtherance of a single overall conspiracy, but rather was a result of separate, unrelated agreements to redeem illegally acquired food stamps. He claims that he had no interest in whether any other redemptions except his own were successful. He contends that he did not aid any others, by agreement or otherwise, in purchasing or redeeming food stamps, ex-

cept for the purchase made by him and Ghanem on January 31, 1980, which, he argues, cannot be used to demonstrate the existence of a conspiracy on or before April 1, 1979, as alleged in the indictment.

This case is different from *Kotteakos.* Here the jury could rationally have found that the appellants and their co-defendants knew, or should have known, that other stores were involved in the illegal purchase and redemption of food stamps, and that the benefits each received were dependent upon the success of the entire venture. *United States v. Perry, supra,* 550 F.2d at 531. *See United States v. Baxter,* 492 F.2d 150, 158 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). This is especially true of Abushi, who had previously lost his authorization to redeem food stamps and had to rely entirely on third parties for redemption of the food stamps he purchased. The fact that Abushi had originally offered to purchase $100,000 in food stamps by himself on January 31, 1980, supports the inference that prior to then he had acted in concert with the other defendant store owners and operators and thus participated in a network designed to redeem unusually large quantities of food stamps without detection by the Food & Nutrition Service. In sum, any separate agreements in this case "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result." *Blumenthal v. United States, supra,* 332 U.S. at 558, 68 S.Ct. at 257. We conclude that there was no variance between the proof at trial and the general conspiracy charged which prejudiced appellants' substantial rights.

### III

At various stages of the proceedings in the district court, appellants timely moved for separate trials on the ground that they had been improperly joined under Fed.R. Crim.P. 8(b).[3] Appellants contend that the

---

3. Fed.R.Crim.P. 8(b) provides:

 Two or more defendants may be charged in the same indictment or information if they

are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense

district court erred in denying these motions. We disagree.

■ We have repeatedly held that a conspiracy count may provide the necessary link to satisfy the requirements of Rule 8(b). *United States v. Adams*, 581 F.2d 193, 197 (9th Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971). Yet the government may not satisfy Rule 8(b) merely by adding a conspiracy count to the indictment. The conspiracy must be charged in good faith. *United States v. Adams, supra*, 581 F.2d at 197. Awad, Shuman, and Ghanem argue essentially that the government filed the conspiracy charge against them in bad faith. Since we have already held that, viewed in the light most favorable to the government, the evidence was sufficient to establish one overall conspiracy as charged in the indictment, it is clear that the government did not bring the conspiracy charge in bad faith.

Abushi, however, raises a somewhat different argument. He contends that the government's proof showed merely the existence of two unrelated conspiracies to defraud the government through the acquisition and redemption of food stamps, tied together only through the fact that both conspiracies redeemed some stamps at the same store. He relies on *United States v. Levine*, 546 F.2d 658, 663–67 (5th Cir. 1977), contending that the basis for the conspiracy count was the false legal premise that proof of proximate or simultaneous conspiracies with one common conspirator is sufficient to establish a single conspiracy.

We need not decide whether *Levine* should be followed in this Circuit. We have held that Rule 8(b), which permits joinder if the defendants "are alleged to have participated ... in the same series of acts or transactions constituting an offense or offenses," is satisfied "as long as all defendants participated in the same series of

transactions, ... even though not all defendants participated in every act." *United States v. Burreson*, 643 F.2d 1344, 1347 (9th Cir.), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). "[W]hen the transactions are basically the same, and when one person serves as a common link between the transactions, joinder under Rule 8(b) is proper." *Id., citing United States v. Patterson*, 455 F.2d 264 (9th Cir. 1972). The facts alleged in the indictment and proved at trial clearly demonstrate the "common link" between the acts which Abushi argues are totally unrelated. Not only were stamps redeemed at the same store, but Abushi joined two members of the allegedly separate conspiracy in offering to purchase $100,000 worth of stamps at the January 31 final meeting with the agents. The "unrelated" acts he argues were, therefore, sufficiently related to constitute a "series of acts or transactions" under Rule 8(b).

■ We next consider whether the district judge erred in denying appellants' motions for severance from prejudicial joinder under Fed.R.Crim.P. 14. Rule 14 motions for severance are committed to the sound discretion of the district court. *United States v. Donaway, supra*, 447 F.2d at 943. The rule provides that a severance may be ordered if it appears that a defendant may be significantly prejudiced by a joint trial with his co-defendants. The test for determining whether the district court abused its discretion is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial. *E.g., United States v. Mills*, 597 F.2d 693, 696 (9th Cir. 1979); *United States v. Gay*, 567 F.2d 916, 919 (9th Cir.), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978); *United States v. Campanale*, 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

or offenses. Such defendants may be charged in one or more counts together or

separately and all of the defendants need not be charged in each count.

■ As with their arguments in support of their motion for misjoinder under Rule 8(b), the appellants focus only on whether the evidence was sufficient to support the finding of an overall conspiracy. They offer nothing else to prove that they were in any way prejudiced by having a joint trial. As we have held that there was sufficient evidence of one overall conspiracy, their argument fails. There was no abuse of discretion.

## IV

■ Appellants argue that their defense of entrapment should have been granted as a matter of law by the district judge. This argument is utterly without merit. Entrapment occurs when the criminal design "originates" with the governmental agents and they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). The controlling question is whether the defendant lacks the predisposition to commit the criminal act, and is actually a person whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. *Id.* at 451, 53 S.Ct. at 216; *see Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (plurality opinion); *United States v. Russell*, 411 U.S. 423, 433–36, 93 S.Ct. 1637, 1643–1645, 36 L.Ed.2d 366 (1973).[4]

■ In order for the appellants to maintain that entrapment existed as a matter of law, there would need to be "undisputed testimony making it patently clear" that they were "otherwise innocent" persons in whom the government had implanted the criminal design. *United States v. Rangel*, 534 F.2d 147, 149 (9th Cir.), *cert. denied*, 429 U.S. 854, 97 S.Ct. 147, 50 L.Ed.2d 129 (1976); *see United States v. Goodwin*, 625 F.2d 693, 698 (5th Cir. 1980). There was no such evidence in this case. Quite to the contrary, reviewing the record in the light most favorable to the government there is substantial evidence to establish the predisposition of all four appellants. They showed little, if any, real resistance to participation in the food stamp transactions when they were proposed by the government agents, nor were they concerned about the illegal nature of that activity.

Special Agent Lee testified that on April 4, 1978, after Awad purchased $150 in food stamps, he asked the agent whether he could get more stamps. Awad responded to Special Agent Cotton's suggestion that perhaps he should find another buyer for the $100,000 in food stamps, "No, no, no. Okay man. You know, just tell him we'll take all of them, one time." Shuman responded similarly to the opportunity. He arrived with Ghanem on the night of April 19, 1979, unsummoned by the government, and stated, "New York you can move million dollars . . . . Why don't you give him our other

4. Appellants argue in their reply brief that, regardless of predisposition, governmental conduct in investigating or facilitating a crime may form the basis of an entrapment defense if it violates the due process clause. Although we need not consider a point raised by an appellant in his reply brief which was not raised in his opening brief or motion for a new trial, *United States v. Puchi*, 441 F.2d 697, 703 (9th Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971), the argument is frivolous in the facts of this case.

It has been suggested that in certain situations the conduct of law enforcement agents may be so outrageous as to contravene fundamental principles of due process and prohibit the prosecution of an accused. *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973); *United*

*States v. Prairie*, 572 F.2d 1316, 1318–19 & n.2 (9th Cir. 1978). However, this long-standing principle, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), is markedly different from the subjective theory of entrapment which appellants have raised. The Court has squarely rejected the subjective theory of the nonconstitutional entrapment defense. *United States v. Russell, supra*, 411 U.S. at 433–36, 93 S.Ct. at 1643–1645; *see id.* at 440–45, 93 S.Ct. at 1646–1649 (Stewart, J., dissenting). Moreover, in this case it is clear that the government's conduct, which mainly involved the solicitation of illegal purchases of food stamp coupons by officers posing as so-called street people, did not come anywhere near the type of conscience-shocking behavior which would violate the due process clause.

number? ... This number is better because I'll be there all day." Shuman also testified that although he had purchased the food stamps on the first occasion to aid the agent financially, on subsequent occasions he had his own self-interest in mind. We doubt whether Awad and Shuman could seriously contend that they were purchasing food stamps for other than personal profit.

Abushi purchased food stamps from Special Agent Ivy on five separate occasions during August and September of 1979. It is clear from Ivy's testimony that all she needed to do to effectuate a given sale was to inform Abushi that she was carrying some stamps which she wanted to sell, and negotiate with him over the price. After purchasing $10,000 in food stamps for $2,500 in cash on September 14, 1979, Abushi expressed an interest in having Ivy provide him at a later date additional food stamps with a face value of about $10,000.

As to Ghanem, not only was his attendance at the April 19, 1979 meeting unplanned by the government, but Agent Cotton testified that Ghanem "took the lead" in the conversation and negotiations. Throughout the April 23, 1979 transaction involving $24,000 worth of food stamps, Ghanem was calm, inquisitive and self-assured. The jury watched a videotape of the January 31, 1980 negotiations for the $100,000 in food stamps, in which Ghanem stated, "You're going to get some more right? And I promise you, I make up the difference. And that's for sure ... this is nothing. I dumped over that—half million one time ... I deal bigger things than this little thing."

The appellants have not pointed to any evidence indicating a reluctance on their part to engage in the illegal activity. To the contrary, the record is replete with instances where the appellants appeared eager to negotiate then and in the future. Although the government made the initial contact with the appellants, this is merely evidence that the government furnished the opportunity for the commission of a crime, not that the appellants were entrapped. *United States v. Glaeser*, 550 F.2d 483, 487 (9th Cir. 1977).

V

A.

The appellants raise several asserted errors in the district court's conspiracy instructions. Awad, Ghanem, and Shuman argue that the court failed to instruct the jury on the elements of the offense charged. They are incorrect. The record shows that the district judge properly instructed the jury regarding the elements of the crime of conspiracy as well as the elements of the substantive offenses charged in the indictment.

The appellants' next contention is that the district judge misstated the law of multiple conspiracies. At trial, the defendants jointly submitted a jury instruction based on the instruction given in *United States v. Bailey*, 607 F.2d 237 (9th Cir. 1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980).[5] The appellants claim the district court erred by omitting the last full paragraph of the jury instruction given in *Bailey*. Without the benefit of the last full paragraph, they argue, the jury is told,

---

5. The instruction in *Bailey* was as follows:

If you find beyond a reasonable doubt that the conspiracy described in Count I did in fact exist between at least two of the defendants, then you must determine which, if any, of the other defendants were members of that conspiracy.

A conspiracy may vary in its membership from time to time and may include two or more separate agreements among its members provided that the participants in the separate agreements are joined together by their knowledge of the essential features and scope of the overall conspiracy and by their

common goal. Where the participants in separate agreements are not so joined, they are not members of a single, overall conspiracy, even though the separate agreements may have participants in common and may have similar goals.

*If you find that a particular defendant may have been a member of another conspiracy but was not a member of the conspiracy described in Count I then you must acquit that defendant of the crime charged in Count I.*

607 F.2d at 243 n.14 (emphasis in original).

in effect, that the conspiracy charged in Count one is broad enough and sufficiently far-reaching to include any conspiracy proven. Abushi maintains that the jury is left with the instruction that either they find the overall conspiracy or several smaller ones, but in either event any conspiracy will suffice for the purposes of Count one. This, he argues, is not the law of the Circuit.

■ When reviewing a claim of error relating to jury instructions, the appellate court must view the instructions as a whole. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975), *quoting Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). A trial judge is given substantial latitude in tailoring jury instructions so long as they fairly and adequately cover the issues presented. *United States v. James*, 576 F.2d 223, 226 (9th Cir. 1978). "[N]either party, including a criminal defendant, may insist upon any particular language." *Id.* Challenges to the trial judge's language or his formulation of the charges justify reversal only for an abuse of discretion. *Id.* at 227; *see United States v. Park, supra*, 421 U.S. at 675, 95 S.Ct. at 1913.

■ If from the evidence the jury might reasonably find one common overall plan as well as several separate and independent agreements, the court should instruct the jury on the issue of multiple conspiracies. *United States v. Eubanks*, 591 F.2d 513, 518 (9th Cir. 1979) (per curiam). Here, the district judge instructed the jury as to multiple conspiracies on three separate occasions. Each of these instructions was consistent with the view that proof of multiple conspiracies or agreements when a single conspiracy was charged in the indictment does not necessarily require that members of those separate conspiracies be acquitted of the overall conspiracy charged. The district judge instructed the jury that if it found two or more separate agreements, it was required

to acquit any defendant who participated only in one or more of the separate agreements, unless it was satisfied from the evidence that the members of those separate agreements had joined together in some fashion by their knowledge of the essential features and scope of an overall conspiracy and by their common purpose to accomplish an overall goal. During the district judge's second attempt to explain the law of multiple conspiracies, he stated:

> If you find some were involved in a conspiracy, and some were involved in a totally separate conspiracy, it then would be proper for you to find the first group guilty, and the second group not guilty, because the mere fact that they have been involved in a second conspiracy by themselves does not mean that they were involved in the conspiracy charged in the indictment.

Not only were the district judge's instructions on multiple conspiracies, taken as a whole, consistent with the law of this Circuit, but it is our view that this specific instruction had essentially the same effect as the third paragraph of the *Bailey* instruction submitted by appellants.

The district judge's conclusion that the existence of subordinate agreements or conspiracies does not preclude the jury from finding the participants of those separate conspiracies guilty of an overall conspiracy, is consistent with our holding in *United States v. Perry, supra*. There, the defendant requested an instruction to the effect that if the jury found two or more unconnected conspiracies, it could not find the defendants in that case guilty of the conspiracy charged in the indictment. We concluded that this proposed jury instruction was an incorrect statement of the law of multiple conspiracies:

> The government does not have to prove that all of the defendants met together at the same time and ratified the illegal scheme. This just is not the nature of a conspiracy .... Generally, the defendants are going to meet and conspire in twos or threes in order to carry out the design of the common overall scheme.

To suggest that defendants should be acquitted of the general conspiracy charged just because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy. *By these separate agreements the defendants became parties to the larger common plan, joined together by their knowledge of their essential features and scope, though not of the exact limits, and by their single goal. These agreements were merely steps in the formation of the larger and more general conspiracy.*

*United States v. Perry, supra,* 550 F.2d at 533 (emphasis added), *citing Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

The district court's initial instruction clearly reflects the theory of multiple conspiracies expressed in *Perry.* Three times during that charge he expressed the idea that in order for the participants of a separate conspiracy to be found guilty of the overall conspiracy charged, the jury must find that such participants were acting with the purpose and goal of that overall conspiracy in mind.[6] After the jury had deliberated several days, the court reiterated this theory of multiple conspiracies and stated, "Does the evidence establish that there is some relationship, some overall plan, some purpose behind the actions of this second group relating it to the actions of the first?"

In addition to instructing the jury properly on the evidence necessary to find a defendant guilty of the overall conspiracy, the court made it very clear that there might be circumstances in which a defendant could be a member of a separate conspiracy, but not guilty of the overall conspiracy charged in the indictment. Since the purpose of the final paragraph in the *Bailey* instruction was to explain to the jury that they must acquit a defendant who is found to be a member of another conspiracy, but not a member of the overall conspiracy charged in the indictment, it cannot be reasonably argued that the present jury instructions varied materially from those given in *Bailey.* We cannot imagine that any juror hearing the instructions given in this case would have thought, as the appellants argue, that the conspiracy charged in Count one was wide-ranging enough to include *any* conspiracy proven.

Finally, the appellants take issue with the use by the district judge of an illustration in re-instructing the jury on the law of multiple conspiracies, contending that its close parallel to the facts of the case had a prejudicial influence on the jury. Although the district judge used an example including a conspiratorial group of three members which is similar in numbers to the Ghanem family, there was no reversible error. The district judge used very general examples, without any reference to the type of activities involved in the present case, and had previously stated to the jury that his examples were not meant to suggest that they "fit[ ] anywhere within the pattern of the case." We do not believe that the judge's examples had a prejudicial ef-

---

**6.** The district judge first stated:

A conspiracy can vary in its membership from time to time and it may include two or more separate agreements among its members in various groupings. But in order to find the responsibility of all of those members of separate agreements for a common conspiracy, you must find that they are joined together in some fashion by their knowledge of the essential features and scope of some overall conspiracy and by their knowledge and purpose to accomplish some overall goal . . . .

He then instructed:

. . . [A]ppraise whether the other defendants, who were charged and are not part of that initial group, do, in fact, have some relationship, some overlying plan or scheme or arrangement whereby their separate activities were enhanced by or related to or grew out of or in some way [were] the product of the conspiracy that you have found.

He finally stated:

So if you find that there are two or more separate agreements, you must acquit the one who belongs to the separate agreement unless you are satisfied from the evidence that the participants have some common understanding of the purpose and goal of the overall plan with those of the other agreement that you have found to exist.

fect on the jury. *See United States v. Dizdar*, 581 F.2d 1031, 1037 (2d Cir. 1978).

## B.

The appellants also assert several errors in the court's entrapment instruction. The first challenge refers to an instruction concerning charitable motives, which Awad and Ghanem argue misled the jury as to the defense of entrapment. In an instruction separate from the entrapment instruction, the court stated that "charitable motives are highly desirable, but robbing a bank to support your favorite charity obviously isn't looked upon favorably by the law." They argue that this instruction essentially eliminated any consideration by the jury as to whether Ghanem and Awad were entrapped when government agents appealed to Ghanem's known weakness—his overseas charities.

■ The district judge's statement regarding charitable motives does not constitute grounds for reversal. This statement was made in an effort to distinguish between motive and intent, and was not directed toward the issue of entrapment. Furthermore, even if the jury mistakenly believed that the instruction as to charitable motives also applied to the issue of entrapment, a possibility we find remote, there is nothing in the record to persuade us that this may have been prejudicial. The record is devoid of evidence, outside of Ghanem's own testimony, that the government attempted to appeal to Ghanem's known weakness for overseas charities. On the contrary, the record demonstrates that the government agents had no contact with Ghanem prior to his entering into the April 19, 1979 transaction, which was at the invitation of Awad and not the government.

■ Awad, Ghanem, and Shuman contend that the district court did not adequately instruct the jury that the government had the burden to prove predisposition beyond a reasonable doubt. They rely on our decision in *Notaro v. United States*, 363 F.2d 169 (9th Cir. 1966). This argument fails, however, since in the present case the district judge corrected the defect we identified in *Notaro* by including language which specifically met our objection.[7] Abushi concedes that the court's instructions correctly allocated the burden of proof of predisposition, but argues that the court erred by omitting any reference to the burden of proof in a subsequent instruction concerning government inducement. Considering the entrapment instructions in their entirety, we are satisfied that the jury was properly informed that the burden of proof rested upon the prosecution. *Notaro* does not require the district court to reiterate the reasonable doubt standard in every paragraph of its entrapment instructions. *See United States v. Wolffs*, 594 F.2d 77, 84 (5th Cir. 1979).

■ Finally, Abushi argues that the district judge's statements concerning the propriety of the government's investigation prejudiced him by placing a presumptive stamp of approval on the governmental conduct in question and by diverting the jury's attention from the question of predisposition.[8] We agree that the judge's preliminary comments on the propriety of the

---

**7.** The court instructed:

 If you should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offenses involved in this case the [sic] —a defendant was ready and willing to commit the crime charged by the indictment whenever the opportunity was afforded, and that the government officers or agents did nothing more than offer that opportunity, then you would find that the defendant was not the victim of entrapment.

 On the other hand, *if the evidence leaves you with a reasonable doubt* whether the defendants had the previous intent or pur-

pose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it would be your duty to find him not guilty.

(Emphasis added).

**8.** The portions of the entrapment instruction complained of were as follows:

 The evidence here has shown that government agents used undercover roles to investigate the activities they were concerned with here. They made tape recordings of conversations and telephone calls.

 It's entirely lawful and proper for law enforcement agents to do these things. They

government's conduct were extraneous. Such considerations are matters for the court and not the jury. *See United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978). Indeed, it was not an issue that should have been discussed with the jury. But it is only the government which can complain of the error, as Abushi was not prejudiced by these comments. First, the judge's statements can hardly be perceived as a stamp of approval. He specifically instructed the jury to decide whether the government's conduct in this case was appropriate. At most, the court informed the jury that the government may permissibly afford the opportunity and facilities for the commission of a crime and in so doing may employ artifice and stratagem. However, such an instruction is not inconsistent with the law. *See Sorrells v. United States, supra*, 287 U.S. at 441–42, 53 S.Ct. at 212. Second, by instructing the jury to consider initially the propriety of the government's actions, the judge at best interposed an additional obstacle to conviction. Any effect which these statements could have had on the jury would thus be favorable, rather than prejudicial, to the appellants. Further, it cannot reasonably be maintained that this admittedly extraneous discussion diverted the jury from its task of determining whether the defendants were predisposed to commit the crime. The district judge ended his discussion of the propriety of the government's actions with the statement: "Even if you decide [that the government's conduct] was appropriate . . . you must then decide . . . was this the unwary criminal, or was it the unwary innocent on whom the government brought its investigative techniques to bear?" Then the district judge introduced his predisposition discussion with the statement: "Let me run briefly through the elements of entrapment as you will have to decide them." Thus, it was made unmistakably

clear to the jury that regardless of a preliminary finding of propriety on the part of the government, the jury still had to decide whether the defendants were predisposed to commit the charged offense.

### C.

The appellants' final claim is that the trial judge failed to comply with Rule 30 of the Federal Rules of Criminal Procedure. Rule 30 provides, in part:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. . . . The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed.

Awad, Ghanem, and Shuman assert that the district judge informed their counsel of the "exact form of the instruction to be used" in regard to the multiple conspiracy and entrapment issues. They argue that the ultimate instruction on these issues was significantly different from the instructions which the court initially indicated it would deliver, and that the court's initial representation as to the substance of the proposed instructions, upon which they relied, prejudiced their ability to make an effective closing argument.

 Contrary to their argument, however, the district judge did not inform counsel of "the exact form of the instruction to be used." The district judge responded to appellants' proposed instructions as follows:

> The instructions that I have given you are the general format and subject matter and deal with the law as to which the jury will be instructed. They are not necessarily in the language which the in-

can use artifice, they can use stratagems, they can use undercover agents, they can use informers. . . .

. . . .

I think it appropriate in determine [sic] whether there was entrapment here or not in appraising the nature and extent of the offenses that the government was trying to

advance, how widespread was the kind of crime? What did it require by way of investigation? Was it appropriate in all of the circumstances presented to the government, on the basis of all of the things that it knew at the time of its investigation, to proceed in the fashion that it did?

struction will be given. I will use such language as I think appropriate. I will interpolate, I will give examples, but you will not be surprised by any of the law.

This is consistent with the requirement of Rule 30 that the court inform counsel of its "proposed action" on their requested instructions prior to their argument to the jury. As we have held previously, the jury was properly instructed on the law of entrapment and multiple conspiracies. Rule 30 does not alter the settled law that a criminal defendant may challenge specific language used in the jury instructions only for a clear abuse of the district court's discretion. Thus, Abushi's contention that he was surprised by the district judge's instruction on predisposition does not alter our holding that, viewing the instructions as a whole, the jury was appropriately instructed. We find nothing in the record to indicate that counsel was misled by the district court's indication of the instructions he would deliver to the jury or that Rule 30 was otherwise violated. The only error in the instructions was the statement relating to the propriety of the government's investigation, which could not conceivably have prejudiced appellants.

AFFIRMED.